IN THE

TENTH COURT OF APPEALS

 




 
 
 
 
 
 
 


 

 



No. 10-08-00212-CV

No. 10-08-00213-CV

No. 10-08-00214-CV

No. 10-08-00215-CV

No. 10-08-00216-CV

 

In re
ETC Katy Pipeline, LTD

 

 



Original Proceeding

 

 



MEMORANDUM  Opinion



 

ETC Katy Pipeline, LTD. (ETC) filed a petition for
writ of mandamus in each of these five original proceedings challenging the
trial court's orders denying its motions to appoint special commissioners and
its orders granting the landowners’ motions to dismiss in each of the
underlying cases.[1]  We will
conditionally grant the writ in each case.

Background

On February 14, 2008, ETC, a gas utility company,
filed five original petitions for condemnation seeking to obtain property from
the landowners through eminent domain.  Commissioners were appointed and a
special commissioners’ hearing was set.  On the day of the hearing, counsel for
ETC told the landowners and the special commissioners that it did not want to
have the hearing and that it would be dismissing its cases.  ETC filed motions
to dismiss and notices to nonsuit its claims against the landowners on March
12, 2008 and, through alleged inadvertence, requested that the cases be
dismissed “with prejudice.”

ETC filed its second set of five condemnation
petitions, at issue in this mandamus, on March 17, 2008 in an effort to cure
the errors contained in the original condemnation petitions.  The trial court
refused to appoint special commissioners for the second condemnation cases. 
The landowners filed motions to dismiss on the grounds of res judicata because
the original petitions were dismissed “with prejudice.”  The trial court signed
orders refusing to appoint special commissioners, granted the motions to
dismiss, and awarded attorney’s fees to the landowners.  ETC brings these five
petitions for writ of mandamus asking us to direct the trial court to vacate
its orders denying ETC’s motions to appoint special commissioners and
dismissing the petitions.




Mandamus Relief

Mandamus is "an extraordinary remedy,
available only in limited circumstances."  In re Chu, 134 S.W.3d
459, 462 (Tex. App.—Waco 2004, orig. proceeding).  A writ of mandamus will
issue only if (1) the trial court violates a duty imposed by law or clearly
abuses its discretion, and (2) there is no other adequate remedy at law, such
as an appeal.  In re Sw. Bell Tel. Co., 226 S.W.3d 400, 403 (Tex. 2007) (orig. proceeding); In re Prudential Ins. Co., 148 S.W.3d 124, 135-36 (Tex. 2004) (orig. proceeding) (citing Walker v. Packer, 827 S.W.2d 833 (Tex. 1992)).

Abuse of Discretion 

ETC argues that the trial court abused its
discretion when it refused to appoint special commissioners after the second
petitions were filed.  A condemnation proceeding is a two-part procedure
involving first, an administrative proceeding, and then if necessary, a
judicial proceeding.  In re State, 65 S.W.3d 383, 385 (Tex. App.—Tyler 2002,
orig. proceeding) (citing Amason v. Natural Gas Pipeline Co., 682 S.W.2d
240, 241-42 (Tex. 1984)).  During the administrative phase, the special
commissioners award compensation for the taking and assess the costs of the
proceeding.  Amason, 682 S.W.2d at 242; see Tex. Prop. Code Ann. § 21.042 (Vernon Supp. 2002), § 21.047 (Vernon 2000).  A trial court does not have jurisdiction in
the administrative phase of a condemnation proceeding; therefore, any judgment
and order made outside of the statutory authority is void.  In re Energy
Transfer Fuel, LP, 250 S.W.3d 178, 181 (Tex. App.—Tyler 2008, orig.
proceeding).  The beginning phase of an eminent domain proceeding is entirely administrative,
and it does not convert into a judicial proceeding until objections to the
special commissioners’ award are filed.  See Tex. Prop. Code Ann.
§ 21.018 (Vernon 1984); Denton County v. Brammer, 361 S.W.2d 198,
200 (Tex. 1962).

Having reviewed the mandamus record before us and
the applicable law, we conclude that the refusal to appoint commissioners and
the “dismissal with prejudice” ruling were abuses of discretion.  The trial
court lacked jurisdiction to act outside of the statute during the
administrative phase of the condemnation proceeding.  See In re State,
85 S.W.3d at 875 (holding that trial court lacks jurisdiction to act beyond
statute during administrative phase of proceeding and any such action is abuse
of discretion).  The trial court abused its discretion because it had a duty to
appoint special commissioners and lacked jurisdiction to dismiss ETC’s cases on
res judicata grounds.  We sustain ETC’s first issues in each proceeding.

Inadequate Remedy at Law 

An abuse of discretion alone does not warrant the
issuance of a writ of mandamus.  We must also consider whether ETC has an
adequate remedy at law by appeal or otherwise.  There is not an adequate remedy
by appeal when a party is in danger of permanent deprivation of
substantial rights.  Id. at 388.  The landowners argue that an adequate
remedy by appeal is available because ETC is currently pursuing appellate
remedies in this court.[2]  See
In re Lerma, 144 S.W.3d 21 (Tex. App.—El Paso 2004, orig. proceeding)
(denying writ when relator had two appeals pending when mandamus was filed).

The Fourth Court of Appeals’ opinion in Garcia
is instructive on this issue.  See Gulf Energy Pipeline Co. v. Garcia,
884 S.W.2d 821, 824 (Tex. App.—San Antonio 1994, orig. proceeding).  In Garcia,
the San Antonio Court of Appeals found mandamus to be proper where the relator,
who was seeking to condemn an easement for a pipeline, faced a sixty-day delay
in the condemnation proceeding due to the trial court's interference and
penalties and expenses associated with the delay.  The Garcia court
concluded that "neither the district court nor a court of appeals has any
mechanism by which it could return the expedited procedure and costs of which
the relator was deprived."  Id.  The court also held that mandamus
relief is generally proper when a judicial body operates to deny a litigant a
peculiar right or directly interferes with the jurisdiction of another court or
administrative body.  Id.

Like Garcia, appeal is not an adequate
remedy in this case.  In Garcia
the trial court, by way of
injunction and continuance, was effectively delaying the commissioners’ hearing
process by sixty days.  Here, the trial court has gone far beyond
Garica by refusing to appoint special commissioners.  Additionally, more
than ninety days have passed since the filing of the original petition.  The Property Code provides condemnors a
substantial right to an expedited hearing and possession of the easement
immediately after the commissioners file their findings.  See id. 
The delay involved in this case, like Garcia, is not the delay of
waiting until a court proceeding is over to appeal, but the delay of wrongfully
halted proceedings over which another body has jurisdiction.  Id.; cf.
HCA Health Servs. v. Salinas, 838 S.W.2d 246, 248 (Tex. 1992) (no adequate
remedy by appeal for litigation deadlocked when two courts attempted to
exercise jurisdiction).

Because the trial court's orders permanently deprive
ETC of the substantial right of an expedited procedure and it has no adequate
remedy by appeal, ETC is entitled to mandamus relief.  See Prudential,
148 S.W. 3d at 135-39.  We sustain ETC’s second issue.  

Conclusion

Having determined that the trial court was without
jurisdiction to refuse to appoint special commissioners and to grant the motions
to dismiss on res judicata grounds, we conditionally grant mandamus relief.  See
In re Energy Transfer Fuel, LP, 250 S.W.3d at 182; see also Browning
v. Prostok, 165 S.W.3d 336, 346 (Tex. 2005).  The writ will issue in each
case only if Respondent fails to withdraw his order granting the motion to
dismiss signed on March 31, 2008, or fails to appoint special commissioners within
21 days from the date of this opinion.

 

BILL VANCE

Justice

 

Before Chief Justice
Gray,

            Justice
Vance, and

            Justice Reyna

            (Chief Justice Gray dissents with a
note)*

Petitions granted 

Opinion delivered and
filed October 1, 2008

[OT06]

 

 

*
(Chief Justice Gray would
deny each of the five petitions for writ of mandamus.  A separate opinion will
not issue.  He notes, however, that while he agrees with the analysis of In
re State, 65 S.W.3d 383 (Tex. App.—Tyler 2002, orig. proceeding) and Gulf
Energy Pipeline Co. v. Garcia, 884 S.W.2d 821 (Tex. App.—San Antonio 1994,
orig. proceeding), those proceedings are easily distinguished.  In State and
Garcia, the administrative portion of the condemnation proceeding was
ongoing, and the trial court was attempting to exercise control over and during
the administrative process.  No final judgment had been rendered dismissing the
proceeding.  Thus, the only way to obtain relief from the trial court’s
interference was by mandamus.  In this proceeding, however, the trial court has
rendered a final judgment of dismissal.  That judgment can be directly and
immediately appealed.  This mandamus proceeding could be a more timely review
of the trial court’s judgment than a direct appeal if we give it our immediate
attention.  But that is also true of any proceeding that has been finally
disposed by the trial court.  If the appeal needs to be expedited because of
the nature of the underlying dispute, it can be.  But there is no
justification, much less authority, for hurtling this proceeding to the front
of the line because it is filed as a mandamus when a direct appeal is not only
available but is actually currently pending and, if appropriate, a motion to
expedite can be filed and considered.  Because there is an adequate remedy by
direct appeal, he would deny ETC’s petition for a writ of mandamus.  The
Court’s ruling will, of course, moot the pending appeals and therefore Chief
Justice Gray would simultaneously dismiss those five proceedings.)








 









[1]
          The
real-parties-in-interest/landowners in the five cases are FPJ Pipeline Corridor
No. 1 L.L.C., FPJ Land Company, L.T.D., Reagan Management Company, Frederick L.
Reagan, John F. Reagan, Patricia R. Myrick, FLR Pipeline Corridor No.1 L.L.C.,
Camp Cooley, LTD., North CC Pipeline Corridor, L.L.C., Martin Pipeline
Corridor, L.L.C., Circle M Ranch, LTD., Ruth Martin Ranch, Inc., McCormick
Pipeline Corridor, L.L.C., Kenneth C. McCormick, Sr., and Kenneth C. McCormick,
Jr.  The Respondent is the Honorable Robert Stem, sitting in the 82nd Judicial
District Court of Robertson and Falls Counties, Texas.

 





[2]               ETC filed
appellate briefs with this court on August 19, 2008 arguing in two issues that (1)
the trial court abused its discretion in dismissing the case with prejudice
when “dismissal with prejudice” was requested inadvertently and (2) that it was
error for the court to deny its post-trial motions requesting that the order be
corrected and dismissed “without prejudice.”  

 








, 485 U.S. 80, 86-87,
108 S. Ct. 896, 900, 99 L. Ed. 2d 75, 82 (1988); Lopez v. Lopez, 757 S.W.2d 721, 723 (Tex.
1988) (per curiam). The court granted Spencer’s motion for new trial on September 12.
      In the meantime, the court sent notice of trial on September 8. The notice informed the
parties that the case was set for “final hearing” on October 23. CPS sent a follow-up notice on
September 21 clarifying that the case would be heard on October 24. Spencer filed a motion for
continuance on September 26 asking for additional time to prepare for trial because: (1) she did
not receive the forty-five days’ notice required by Rule of Civil Procedure 245; and (2) her
counsel needed additional time to organize the “approximately 1,000 pages” of documents
provided by CPS on September 21 and to conduct appropriate discovery. The court heard
Spencer’s continuance motion on September 29 and “grant[ed] the continuance until October
31st.”
      Spencer filed a second continuance motion on October 19, contending that the notice given
by the court on September 29 of the October 31 setting still did not provide the forty-five days’
notice required by Rule 245. The court heard this motion on October 24 and denied it. Spencer
noticed depositions for three of CPS’s witnesses on October 25. CPS filed a motion to quash these
deposition notices the next day. The court heard this motion on October 27. At the hearing,
Spencer made a third continuance motion again urging Rule 245 as the basis for the continuance. 
The court granted CPS’s motion to quash and denied Spencer’s third continuance motion that same
day.
      The parties proceeded to trial as scheduled on October 31. The jury returned its verdict on
November 9. The court signed the decree on November 17.



NO EVIDENCE
      Spencer claims in her second issue that the record contains no evidence or factually
insufficient evidence to support a finding that she knowingly placed or allowed J.B. to remain in
dangerous conditions or surroundings.



      When we decide a “no evidence” point, we consider only the evidence and inferences which
tend to support the contested issue and disregard all evidence and inferences to the contrary. 
Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). We will sustain a no
evidence point if: (a) there is a complete absence of evidence of a vital fact; (b) we are barred by
rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c)
the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence
conclusively establishes the opposite of the vital fact. Id. (citing Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)). 
“More than a scintilla of evidence exists when the evidence supporting the finding, as a whole,
‘rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions.’” Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995) (quoting
Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994)). We apply this standard of
review in termination cases, which require proof by clear and convincing evidence, even though
this standard was developed in preponderance-of-the-evidence cases. See In re A.P., 42 S.W.3d
248, 256 (Tex. App.—Waco 2001, no pet.); Justice Bill Vance, The Clear and Convincing
Evidence Standard in Texas: A Critique, 48 Baylor L. Rev. 391, 413 (1996).
      When J.B. was three months’ old, part of the roof of the house in which Spencer and he were
living collapsed in a rainstorm. They “immediately moved out.” They lived for a period of time
in a local motel. An acquaintance of Spencer’s testified that her motel room was “filthy.” She
would not have allowed her own children to live “in something like that.” According to this
witness’s testimony, Spencer and J.B. lived in the motel room for a period of time, though she
could not say how long.
      The evidence regarding the condition of Spencer’s motel room constitutes some probative
evidence that Spencer knowingly allowed J.B. to remain in dangerous conditions or surroundings. 
Thus, we conclude that the no-evidence portion of Spencer’s second issue is without merit. In
view of our disposition of the no-evidence portion of Spencer’s second issue, we need not address
the no-evidence portions of her third and fourth issues.


 In view of our disposition of Spencer’s
notice issue, we need not address those portions of her second, third and fourth issues which
challenge the factual sufficiency of the evidence to support the verdict.
NOTICE OF TRIAL SETTING
      Spencer argues in her first issue that reversal is required because she did not receive the notice
required by Rule 245. We agree.
      Rule 245 provides in pertinent part:
The Court may set contested cases on written request of any party, or on the court's
own motion, with reasonable notice of not less than forty-five days to the parties of a first
setting for trial, or by agreement of the parties; provided, however, that when a case
previously has been set for trial, the Court may reset said contested case to a later date
on any reasonable notice to the parties or by agreement of the parties. Noncontested
cases may be tried or disposed of at any time whether set or not, and may be set at any
time for any other time.

Tex. R. Civ. P. 245.
      Rule 245 requires that a party to a contested case receive “notice of not less than forty-five
days” for a first trial setting. See id. The district clerk notified the parties on September 8 that
the case was set for trial on October 23. The clerk sent this notice by facsimile machine and by
certified mail, return receipt requested. This added three days to the forty-five provided by Rule
245. Id. 21a; Lewis v. Blake, 876 S.W.2d 314, 316 (Tex. 1994) (per curiam). Thus, the trial
could not have commenced before October 26. For this reason, the September 8 notice did not
provide adequate notice of trial under Rule 245.
      CPS sent a letter to the attorneys in the case on September 21 notifying them that the trial
would begin on October 24. Although the record does not indicate the manner in which this letter
was served on counsel, the letter itself is dated only thirty-three days before the trial setting. 
Thus, it did not satisfy Rule 245.
      The court heard Spencer’s first motion for continuance on September 29. Apparently the
court agreed that its initial notice did not satisfy Rule 245, because it granted Spencer’s
continuance motion in part. The court rescheduled Spencer’s trial for October 31. Thus, the court
gave Spencer thirty-two days’ notice of the October 31 trial setting. This did not satisfy Rule 245.
      Spencer’s second and third continuance motions objected that the court’s September 29 notice
still did not satisfy Rule 245. CPS responded that under the combined notices Spencer had more
than forty-five days notice (from September 8 to October 31) that her case would go to trial. The
court apparently accepted this reasoning and denied Spencer’s second and third continuance
motions.
      Rule 245 requires a minimum of forty-five days’ notice of the trial “setting.” Id. 245. Notice
that a case is going to trial does not equate to notice of when the case is going to trial. None of
the notices in this case provided the required notice. See Bell Helicopter Textron, Inc. v. Abbott,
863 S.W.2d 139, 140-41 (Tex. App.—Texarkana 1993, writ denied). Accordingly, the court
abused its discretion by denying Spencer’s continuance requests. We now decide whether this
error requires reversal.
      Several courts have reversed for violation of Rule 245 without reference to harm. See, e.g.,
Platt v. Platt, 991 S.W.2d 481, 484 (Tex. App.—Tyler 1999, no pet.); In re Estate of Crenshaw,
982 S.W.2d 568, 571 (Tex. App.—Amarillo 1998, no pet.); Carson v. Hagaman, 824 S.W.2d
267, 269-70 (Tex. App.—Eastland 1992, no writ). The courts seem to have done so because of
a perception that providing less notice than required by Rule 245 constitutes a due process
violation or because compliance with the rule is “mandatory.” See Platt, 991 S.W.2d at 483;
Crenshaw, 982 S.W.2d at 571; Carson, 824 S.W.2d at 269-70. At least one court has conducted
a harm analysis before reversing for violation of Rule 245. See Bell Helicopter Textron, 863
S.W.2d at 141.
      Due process requires that a party receive “reasonable notice” of trial. See Peralta, 485 U.S.
at 84, 108 S. Ct. at 899, 99 L. Ed. 2d at 81; In re Marriage of Parker, 20 S.W.3d 812, 818 (Tex.
App.—Texarkana 2000, no pet.). “Rule 245 provides a notice requirement that goes beyond the
requirements of due process.” Parker, 20 S.W.3d at 818. We agree with this reasoning and
conclude that the fact that a party has received less than the forty-five days’ notice required by
Rule 245 does not, standing alone, constitute a due process violation. Id. at 818-19.
      To obtain reversal on the basis of trial error, a party must establish that the error was
“harmful.” See Tex. R. App. P. 44.1(a); Texas Dep’t of Human Servs. v. White, 817 S.W.2d 62,
63 (Tex. 1991); Owens-Corning Fiberglas Corp. v. Malone, 916 S.W.2d 551, 557 (Tex.
App.—Houston [1st Dist.] 1996), aff’d, 972 S.W.2d 35 (Tex. 1998). A trial error requires
reversal (i.e., is “harmful”) if it:
(1) probably caused the rendition of an improper judgment; or
 
(2) probably prevented the appellant from properly presenting the case to the court
of appeals.

Tex. R. App. P. 44.1(a); White, 817 S.W.2d at 63.
      Spencer’s attorneys made their first appearance in her behalf on September 7 when they filed
the motion for new trial. CPS provided counsel with a copy of “the Department’s file” on
September 21. According to Spencer’s counsel, “The file contains approximately 1000 pages,
completely out of order, which must be organized, categorized and reviewed prior to even being
able to depose witnesses.” CPS did not dispute this characterization in the hearing on Spencer’s
first continuance motion.
      Spencer’s counsel served discovery requests on CPS on September 23. The court heard
Spencer’s first continuance motion on September 29. Spencer’s counsel informed the court in this
hearing that he would like to depose some of CPS’s witnesses after reviewing CPS’s discovery
responses. He noted that there would not be adequate time to accomplish this with the October
24 setting.
      CPS’s counsel responded:
[A]s the court is probably aware, it’s my practice to give the respondent’s attorney the
entire record in exchange for them agreeing not to serve me with discovery. Ms.
Maughan was insisting that she get the record immediately, so I just told CPS to give her
the record as soon as possible. To answer this discovery, I’m going to just look through
the record to answer it. I’m going to get the same disorganized record that they have got. 
They can look through the record and answer that as well as I can— probably even
better—because I don’t even have the record yet and I’m probably not going to request
it for another two weeks. I’m going to have to go through that same record and try to
prepare for the case.

As noted above, the court partially granted Spencer’s continuance, moving the trial setting one
week to October 31.
      CPS responded to Spencer’s initial discovery requests on October 24. The next day, Spencer
noticed three CPS witnesses for depositions on October 30, the day before trial. CPS filed a
motion to quash these deposition notices on October 26 on the basis that the depositions were set
less than thirty days before trial. See Tex. R. Civ. P. 190.3(b)(1)(A). The court heard CPS’s
motion to quash and Spencer’s third continuance motion the next day. The court granted CPS’s
motion to quash and denied Spencer’s continuance motion, and the parties proceeded to trial four
days later.
      Spencer argues that she was harmed by the court’s error because she did not have sufficient
opportunity to conduct the depositions she felt necessary to present her case. CPS responds that
the court could have quashed Spencer’s deposition notices even if it had given her additional notice
of trial because the depositions still would have been set less than thirty days before trial. We
note, however, that the court has discretion not to quash a deposition set less than thirty days
before trial. See Tex. R. Civ. P. 190.4(a) (court may set its own discovery control plan “tailored
to the circumstances of the specific suit”), 190.5 (“court may modify a discovery control plan at
any time”), 191.1 (except where expressly prohibited, discovery rules “may be modified in any
suit . . . by court order for good cause”).
      Rule of Appellate Procedure 44.1(a)(2) provides that an error in a civil case will require
reversal if it “probably prevented the appellant from properly presenting the case to the court of
appeals.” Tex. R. App. P. 44.1(a)(2). We have previously held that a trial court's improper
refusal to permit the defendants in a class-certification case to present evidence “plainly prevented
Defendants from presenting their case to us.” See Monsanto Co. v. Davis, 25 S.W.3d 773, 786
(Tex. App.—Waco 2000, pet. dism’d w.o.j.). We likewise hold that the court’s failure to provide
the notice required by Rule 245 “plainly prevented [Spencer] from presenting [her] case to us”
because it prevented her from developing evidence important to her case. Id. Accordingly, we
conclude that Spencer’s first issue is meritorious.
      Even though this error requires reversal, we will also address two other issues likely to arise
on the retrial of this cause. See Edinburg Hosp. Auth. v. Treviño, 941 S.W.2d 76, 81 (Tex.
1997); Indemnity Ins. Co. of N. Am. v. Williams, 129 Tex. 51, 53, 99 S.W.2d 905, 906 (1937);
Boone v. LeGalley, 29 S.W.3d 614, 616 (Tex. App.—Waco 2000, no pet.).
EVIDENCE FROM PRIOR REMOVAL
      Spencer’s fourteenth issue challenges the court’s admission of testimony and photographs
regarding the condition of her home several years before J.B. was born. She contends that this
evidence is irrelevant and unfairly prejudicial. CPS responds that the evidence was admissible to
rebut Spencer’s testimony and that of a former CPS caseworker.
      The decision to admit or exclude evidence rests within the sound discretion of the trial court. 
See Texas Dep’t of Transp. v. Able, 35 S.W.3d 608, 617 (Tex. 2000); In re J.O.C., 47 S.W.3d
108, 112 (Tex. App.—Waco 2001, no pet.). A trial court abuses this discretion when it rules on
the admissibility of the evidence in an arbitrary or unreasonable manner or without reference to
guiding rules or principles. See J.O.C., 47 S.W.3d at 112 (citing Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985)); accord City of Brownsville v. Alvarado,
897 S.W.2d 750, 754 (Tex. 1995).
      We note that the condition of Spencer’s home several years before J.B.’s birth has no
relevance to the issue of whether she knowingly placed or allowed J.B. to remain in dangerous
conditions or surroundings.


 See In re D.T., 34 S.W.3d 625, 632-33 (Tex. App.—Fort Worth
2000, pet. denied) (“the environment of the child must be examined to determine if that is a source
of endangerment to the child”); In re B.B., 971 S.W.2d 160, 169 (Tex. App.—Beaumont 1998,
pet. denied) (no evidence to support termination on this basis when there was “no evidence in the
record of the conditions or surroundings P.B. was in for th[e] few days [he was in his mother’s
custody before removal]”); see also Ybarra v. Texas Dep’t of Human Servs., 869 S.W.2d 574, 577
(Tex. App.—Corpus Christi 1993, no writ) (“The relevant time frame to determine whether there
is clear and convincing evidence of endangerment is before the child[ is] removed.”).
      “Rebuttal evidence is evidence given to disprove facts given in evidence by an adverse party.” 
Apresa v. Montfort Ins. Co., 932 S.W.2d 246, 251 (Tex. App.—El Paso 1996, no writ) (emphasis
omitted) (quoting Valley Indus., Inc. v. Cook, 767 S.W.2d 458, 462 (Tex. App.—Dallas 1988,
writ denied)); accord In re Bledsoe, 41 S.W.3d 807, 813 (Tex. App.—Fort Worth 2001, orig.
proceeding). “Rebuttal testimony can be introduced only after the parties have closed the evidence
offered in chief. They must then limit their rebuttal to those issues which were placed in conflict
by the adverse party’s evidence during the case in chief.” Greenstein, Logan & Co. v. Burgess
Mktg., Inc., 744 S.W.2d 170, 179 (Tex. App.—Waco 1987, writ denied) (citation omitted).
      CPS called Spencer as its first witness. Spencer testified under questioning by counsel for
CPS that CPS removed her four children from another relationship in March 1995 because her
home was “filthy nasty” and “not suitable for children to live in.”


 Counsel for CPS pressed
Spencer regarding the conditions of the home:
      Q:  Now, you had disabled the smoke detector in that house; is that correct?
 
      A:  No, I did not.
 
      Q:  You weren’t using it to—you hadn’t taken out the battery and used it to burn incense
with?
 
      A:  No, I did not.
 
      Q:  Had anyone done that?
 
      A:  No.
 
      Q:  So the smoke detector was working fine at that time?
 
      A:  To my knowledge, it was.

      CPS called Jennifer Tustin during its case-in-chief to testify about the agency’s prior
involvement with Spencer’s children. CPS assigned Tustin to Spencer’s case in October 1997 for
“family reunification.” Tustin testified that, during the first three months of Tustin’s involvement,
Spencer was doing well in her efforts to comply with the service plan established by CPS.


 
According to Tustin:
Things appeared to disintegrate probably about approximately three months into my
case with Kaltina. She had done really well at the beginning. She was passing her
inspections, keeping her house clean, she had gotten a job, you know, things were going
along well, and then all of a sudden it just, boom, it went bad and just rapidly
disintegrated.

Tustin described Spencer’s apartment during the first few months of her involvement in the case
as follows:
Almost always it was clean or when I would show up, she was in the process of
cleaning it. I remember specifically her cleaning behind the stove and doing a lot of
things that even I didn’t do at home, and I was very impressed with that.

Tustin concluded her testimony on direct examination by stating that she never saw anything that
would be hazardous to the children on any of her home visits.
      During its rebuttal case, CPS presented the testimony of a Waco police sergeant who was
dispatched to Spencer’s apartment in March 1995.


 She found Spencer’s children alone in the
apartment. The sergeant described the apartment as “very filthy.” CPS presented seventeen
photographs of the apartment which the court admitted over Spencer’s objections. Sixteen of the
photographs depict various rooms in the apartment. One depicts a smoke detector with the cover
removed and incense inserted, presumably for burning.
      After the police sergeant, CPS called caseworker Staci Love who was assigned to Spencer’s
case in October 1996. Love made a home visit that month and found it to be extremely filthy. 
The court admitted four photographs taken by Love during the October 1996 visit. Love testified
on cross-examination that she noticed a constable serving Spencer with an eviction notice one day
when she was driving by Spencer’s apartment after the case had been transferred to Tustin and the
family reunification unit. She “stopped to see, since [she] had prior history, what was going on.” 
She testified that the house was “in total disarray” on that occasion as well.
      The testimony and photographs offered through the police sergeant and caseworker Love do
not qualify as rebuttal evidence because CPS offered them to rebut evidence presented during its
own case-in-chief. See Valley Indus., 767 S.W.2d at 462. Moreover, only a single photograph
offered through the police sergeant actually rebuts Spencer’s testimony (namely, that her smoke
detector had not been altered to burn incense), and none of the photographs or testimony rebuts
Tustin’s testimony (namely, that Spencer kept a clean apartment from October 1997 to early
1998).


 Accordingly, we conclude that the court abused its discretion by admitting this evidence. 
Thus, Spencer’s fourteenth issue is meritorious.
EXPERT TESTIMONY
      Spencer’s fifteenth issue challenges the expert testimony of Dr. James Shinder offered by CPS
on the issues of Spencer’s parenting abilities and whether termination of her parental rights would
be in J.B.’s best interest.


 Specifically, Spencer contends that CPS failed to demonstrate that a
parenting assessment Dr. Shinder conducted and from which he drew his conclusions is based on
a reliable methodology.
Pertinent Authorities
      Rule of Evidence 702 governs the admissibility of expert testimony. See Tex. R. Evid. 702;
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex. 1998); E.I. du Pont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 554 (Tex. 1995). Once the opposing party objects
to proffered expert testimony, the proponent of the witness’s testimony bears the burden of
demonstrating its admissibility. See Guadalupe-Blanco River Auth. v. Kraft, 77 S.W.3d 805, 807
(Tex. 2002); Robinson, 923 S.W.2d at 557. To be admissible, the proponent must demonstrate:
(1) that the expert is qualified; and (2) that the expert’s testimony is relevant and reliable. See
Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001); Robinson, 923 S.W.2d at 556;
see also Kraft, 77 S.W.3d at 807.
      These are threshold issues which the trial court determines under Rule of Evidence 104(a)
before admitting the testimony. See Tex. R. Evid. 104(a); Gammill, 972 S.W.2d at 718;
Robinson, 923 S.W.2d at 556. In this regard, the trial court acts as a “gatekeeper.” See Gammill,
972 S.W.2d at 726; Tarrant Reg’l Water Dist. v. Gragg, 43 S.W.3d 609, 618 (Tex. App.—Waco
2001, pet. granted); see also Judge Harvey Brown, Eight Gates for Expert Witnesses, 36 Hous.
L. Rev. 743, 744 (1999). We review the court’s determination under an abuse-of-discretion
standard. See Kraft, 77 S.W.3d at 807; Helena Chem. Co., 47 S.W.3d at 499; Robinson, 923
S.W.2d at 558. We examine the record as a whole when we review a preliminary determination
under Rule 104(a). See St. Paul Med. Ctr. v. Cecil, 842 S.W.2d 808, 815 (Tex. App.—Dallas
1992, no writ) (citing Moore v. Polish Power, Inc., 720 S.W.2d 183, 192 (Tex. App.—Dallas
1986, writ ref’d n.r.e.)).
      The Supreme Court has identified a non-exclusive list of factors which can be considered in
assessing reliability:
(1) the extent to which the theory has been or can be tested;
 
(2) the extent to which the technique relies upon the subjective interpretation of the
expert;

      (3) whether the theory has been subjected to peer review and/or publication;

      (4) the technique's potential rate of error;
 
(5) whether the underlying theory or technique has been generally accepted as valid by
the relevant scientific community; and
 
(6) the non-judicial uses which have been made of the theory or technique.

See Gammill, 972 S.W.2d at 720 (citing Robinson, 923 S.W.2d at 557); see also Daubert v.
Merrell Dow Pharms., Inc., 509 U.S. 579, 593-95, 113 S. Ct. 2786, 2796-98, 125 L. Ed. 2d 469,
482-84 (1993).
      By its terms, Rule 702 applies to testimony based on “scientific, technical, or other
specialized knowledge.” Tex. R. Evid. 702. Various classifications have arisen concerning the
types of testimony governed by the rule. Some cases have distinguished between “scientific” and
“non-scientific” expert testimony. See, e.g., Gammill, 972 S.W.2d at 724; Nenno v. State, 970
S.W.2d 549, 560 (Tex. Crim. App. 1998). Some decisions have used the language of the rule
itself by referring to some experts as possessing “specialized knowledge.” See, e.g., Kraft, 77
S.W.3d at 807 (quoting Tex. R. Evid. 702). In Nenno, the Court of Criminal Appeals divided
“scientific” expertise into two subcategories: “hard” sciences and “soft” sciences. See Nenno,
970 S.W.2d at 560.
      In Gammill, the Supreme Court noted a potential difference between expert testimony based
on methodology and that based on experience. See Gammill, 972 S.W.2d at 722-27. The Court
cited the oft-quoted


 “beekeeper” analogy to illustrate the distinction between methodological and
experiential expert testimony:
[I]f one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical
engineer might be a helpful witness. Since flight principles have some universality, the
expert could apply general principles to the case of the bumblebee. Conceivably, even
if he had never seen a bumblebee, he still would be qualified to testify, as long as he was
familiar with its component parts.
 
On the other hand, if one wanted to prove that bumblebees always take off into the
wind, a beekeeper with no scientific training at all would be an acceptable expert witness
if a proper foundation were laid for his conclusions. The foundation would not relate to
his formal training, but to his firsthand observations. In other words, the beekeeper does
not know any more about flight principles than the jurors, but he has seen a lot more
bumblebees than they have.

Gammill, 972 S.W.2d at 724-25 (quoting Berry v. City of Detroit, 25 F.3d 1342, 1349-50 (6th
Cir. 1994)).
      Nevertheless, the Court made clear that expert testimony cannot always be neatly categorized.
That said, it is equally clear that the considerations listed in Daubert and in 
Robinson for assessing the reliability of scientific evidence cannot always be used with
other kinds of expert testimony. To borrow the Berry court’s analogy, a beekeeper need
not have published his findings that bees take off into the wind in a journal for peer
review, or made an elaborate test of his hypotheses. Observations of enough bees in
various circumstances to show a pattern would be enough to support his opinion. But
there must be some basis for the opinion offered to show its reliability. Experience alone
may provide a sufficient basis for an expert's testimony in some cases, but it cannot do
so in every case. A more experienced expert may offer unreliable opinions, and a lesser
experienced expert’s opinions may have solid footing. The court in discharging its duty
as gatekeeper must determine how the reliability of particular testimony is to be assessed.

Gammill, 972 S.W.2d at 726. More recently the Court noted:
In Robinson, we identified six nonexclusive factors to determine whether an expert's
testimony is reliable and thus admissible. But in Gammill we recognized that the 
Robinson factors may not apply to certain testimony. In those instances, there still must
be some basis for the opinion offered to show its reliability, and, ultimately, the trial
court must determine how to assess reliability.

Helena Chem. Co., 47 S.W.3d at 499 (citations omitted).



      From these authorities we conclude that a court should attempt first to apply the Robinson
factors to proffered expert testimony. Perhaps only a few of the factors will be useful in a
particular case. In other cases, none of the factors will be helpful. In either case, the trial court
must exercise its discretion to identify and employ other factors as necessary to assess the
reliability of the proffered testimony. See Helena Chem. Co., 47 S.W.3d at 499; Gammill, 972
S.W.2d at 726; Robinson, 923 S.W.2d at 557.
      The reliability of Dr. Shinder’s testimony is at issue here. For purposes of Rule 702,
reliability includes three components: (1) foundational reliability;


 (2) methodological reliability;



and (3) “connective” reliability.


 See Brown, 36 Hous. L. Rev. at 747-49 (citing Gammill, 972
S.W.2d at 726-28; Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997);
Robinson, 923 S.W.2d at 555-56); see also Helena Chem. Co., 47 S.W.3d at 499. Spencer
specifically challenges the reliability of Dr. Shinder’s methodology.
The Testimony at Issue
      Dr. Shinder is a psychologist with nearly thirty years’ experience. He received a masters
degree in public health in 1979. His masters research focused on the issues of “abuse and
neglect.” He holds memberships with the American Psychological Association, the Texas
Psychological Association, and several other unidentified professional groups. His practice
focuses “almost exclusively [on] the areas of abuse and neglect and various forensic or criminal
or criminally-oriented behaviors.”
      Dr. Shinder conducted a “parenting assessment” of Spencer almost a year before trial. In his
own words, his testimony at trial related “primarily or . . . exclusively in [his] involvement in
providing the parenting assessment” and “to [his] observations and conclusions regarding her
parenting capabilities.”
      Dr. Shinder described his methodology as follows:
Very briefly, a parenting assessment involves a complete review of all existing records
and then questioning of the individual in two areas. You’re looking at the extent of their
knowledge about parenting, as well as what action they have taken in regard to areas
where they have knowledge of problems with their own children.

During a hearing outside the presence of the jury, Dr. Shinder provided the following testimony
regarding his methodology: 
      Q:  How often have you used this approach in the past?
 
      A:  It’s frequently used. I did one as recently as last night in the office. It’s a very
commonly pursued type of an evaluation.
 
      Q:  Does this approach generally require a subjective or objective interpretation?
 
      A:  It’s clearly objective. You’re attempting to determine the extent of someone’s
knowledge. “Are you aware of this information or not,” and then you ask
them, in fact, have they acted upon that in various ways.
 
      Q:  Do you feel another person in your field using your same approach would have
gotten fairly similar results to what you received?
 
      A:  Yes.
 
      Q:  Is your approach or theory generally accepted by the community, the scientific
community within which you belong?
 
      A:  To the best of my knowledge, yes.
 
      Q:  Do you know by what groups or organizations it is generally accepted or relied
upon?
 
      A:  That’s a difficult question. Groups or organizations. It’s a standard format
that’s utilized throughout the field in all areas. Some of the questions that I use
I’ve obtained through a questionnaire that was put out by the American
Academy of Pediatrics. There is one area where I use a limited number of
questions which I don’t know the name of the national group, but it’s a dietary
management or dietician’s group or whatever. I think the major areas of
questioning are accepted by most national groups.
 
      Q:  Do you know how long this has been accepted?
 
      A:  Again some [of] the questions I’m sure have many, many years of acceptance
because basically as long as we’ve accepted the need to refrigerate foods or the
need to provide children with immunizations, things of that nature.

      The record does not contain a copy of the questionnaire Dr. Shinder used to conduct Spencer’s
parenting assessment. However, his testimony indicates that he asked questions which touched
upon the following topics: goals for the children’s future;


 personal acknowledgment of past child-rearing mistakes;


 ability to meet the needs of the children;


 extent of support from relatives and
others in child-rearing;


 “parental insight”; “parental energy”; child-rearing practices;


 ability
to handle crises;


 interpersonal relations with her children;


 and food preparation awareness.



      Dr. Shinder relied on the parenting assessment and Spencer’s “extensive range of personal[ity]
problems as well as historical data”


 to conclude that termination of her parental rights would be
in J.B.’s best interest.
Analysis
      We will examine the methodological reliability of Dr. Shinder’s testimony first in light of the
Robinson factors. If these factors do not enlighten us in this inquiry, we will then look to other
appropriate factors.
1. Extent to Which the Theory Has Been or Can Be Tested
      According to Dr. Shinder’s testimony, his parenting assessment has never been tested by an
independent organization.
[T]here are some things that are such obvious realities that they don’t need to be peer
reviewed or further researched. The sun will rise tomorrow morning. We don’t need
to peer review it and research it. It’s just a reality. A parenting assessment is almost that
concrete when you start asking questions about the care of children.

Thus, this factor may not apply to the parenting assessment.
2. Extent to Which the Technique Relies 
upon the Subjective Interpretation of the Expert

      Dr. Shinder described his parenting assessment as objective in nature. “It’s clearly objective. 
You’re attempting to determine the extent of someone’s knowledge.”
I wouldn’t consider it to be subjective because of the realities of parenting. I will present
the information to the average—or the jury. The average juror has dealt with just about
every similar consideration in raising their own children. I don’t think it’s subjective. 
I think it’s objective. Now, there are things that are realities that have to be addressed.

Although Dr. Shinder describes the assessment as “clearly objective,” his reluctance to make a
copy of the questionnaire available for independent review makes his assessment subjective in
practice.
3. Whether the Theory Has Been Subjected to Peer Review and/or Publication
      Dr. Shinder testified that he acquired some of the questions used in his parenting assessment
from a brochure published by the American Academy of Pediatrics. Some of the questions came
from an unidentified national dietetic organization. He consulted at least twice with a local
pediatrician when he initially developed the parenting assessment. Since that time, he has not
sought peer review. According to Dr. Shinder, “To publish would be suicidal because you folks
[attorneys] would read every publication and you would use every statement I make against me
on the stand, so I can’t publish until I retire.”
      Dr. Shinder named the Academy of American Pediatricians and an unidentified national
dietetic organization as sources for many of the questions used in his parenting assessment. 
However, he did not produce the brochure purportedly published by the pediatrician’s organization
and he could not even name the dietetic organization. His failure to do so and his reluctance to
publish his questionnaire weighs against the reliability of his methodology. See Minnesota Mining
& Mfg. Co. v. Atterbury, 978 S.W.2d 183, 200 (Tex. App.—Texarkana 1998, pet. denied) (“this
Court cannot do th[e] required task if an expert does not cite to and explain precisely the studies
that he relies upon”); America W. Airlines, Inc. v. Tope, 935 S.W.2d 908, 919 (Tex. App.—El
Paso 1996, no writ) (“Peer review of [expert]’s method was limited, and she offered no examples
of publication of her work”); see also Green v. State, 55 S.W.3d 633, 640 (Tex. App.—Tyler
2001, pet. ref’d) (“Though [expert] testified that there had been books and articles published in
the field, he did not name any book, article, or publication of any type”).
                                  4. The Technique's Potential Rate of Error
      Dr. Shinder proffered no testimony regarding the potential rate of error which might occur
from the use of his parenting assessment. He did testify that “another person in [his] field using
[his] same approach would have gotten fairly similar results.” Again, Dr. Shinder’s failure to cite
any particular studies or reports supporting this assertion weighs against the reliability of his
methodology. Id.
5. Whether the Underlying Theory or Technique Has Been Generally
Accepted as Valid by The Relevant Scientific Community

      Dr. Shinder testified that “to the best of [his] knowledge” his approach is generally accepted
by the scientific community to which he belongs. He could not identify any groups or
organizations by which his approach is generally accepted. “That’s a difficult question. Groups
or organizations. It’s a standard format that’s utilized throughout the field in all areas.” 
      In a similar vein, Dr. Shinder stated that “[t]here are a number of texts that have been written
specific . . . to th[e] topic” of “scientific[ ] confirm[ation] that it’s in the best interest of a child
to have that child’s parental rights terminated [sic].” He did not name any of these scientific texts
however.
      As with the preceding two factors, Dr. Shinder’s inability to produce any specific texts or
publications supporting his contention that his parenting assessment is generally accepted in the
scientific community weighs against the reliability of his methodology. Id.
6. Non-judicial Uses Which Have Been Made of the Theory or Technique
      Dr. Shinder’s testimony suggests that he employs his parenting assessment almost exclusively
in courtroom settings. “I think [the assessment questions have] been analyzed in court many
times. . . . [I]f one chooses to do the type of work I do, you’re in court a great deal.” Our
research discloses at least six reported cases since 1997 in which CPS offered Dr. Shinder’s
testimony in a termination case.



      The fact that Dr. Shinder employs his parenting assessment almost exclusively in connection
with judicial proceedings weighs against the reliability of his methodology.
Summary
      Regarding the Robinson factors, CPS proffered only the testimony of Dr. Shinder to establish
the reliability of his methodology. Dr. Shinder offered no specific, independent sources to support
the reliability of his methodology. See Kraft, 77 S.W.3d at 808 (“Gholson’s ‘bald assurance’ that
he was using the widely accepted approach was not sufficient to demonstrate that his opinion was
reliable.”); Gammill, 972 S.W.2d at 727 (“The district court was not required, in Joiner’s words,
to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.”)
(quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d
508, 519 (1997)); Robinson, 923 S.W.2d at 559 (expert’s “self-serving statements that his
methodology was generally accepted and reasonably relied upon by other experts in the field are
not sufficient to establish the reliability of the technique”). Accordingly, we conclude that the
court abused its discretion by admitting Dr. Shinder’s testimony. Thus, Spencer’s fifteenth issue
is meritorious.
      We need not address the remainder of Spencer’s issues.
STATUTORY DISMISSAL DATE
      Sections 263.401 and 263.403 of the Family Code provide that a suit in which CPS has been
awarded temporary custody must be dismissed no later than eighteen months after the court’s
initial order appointing CPS as temporary managing conservator unless the children are returned
to their parent or a final order is rendered. See Tex. Fam. Code. Ann. §§ 263.401, 263.403
(Vernon Supp. 2002). That time period expired in this case on December 18, 2000. Thus, any
retrial of this cause will necessarily occur beyond the statutorily-mandated dismissal date.
      The Family Code does not speak to this situation. In 2001, the Legislature added section
263.405 which provides specific timetables and guidelines for an appeal in this type of case. See
id. § 263.405 (Vernon Supp. 2002). However, section 263.405 is silent regarding any post-appeal
timetables. Therefore, we will set a dismissal date to guide the parties on remand. See Tex. R.
App. P. 43.6.
      It could be argued that the issue of an appropriate post-appeal dismissal date will not be ripe
for our review until such time as the trial court dismisses this cause under section 263.401 or
renders an “untimely” final order. However, waiting until such time creates a very real potential
that J.B. will become the subject of at least two future appellate proceedings: one addressing the
propriety of the court acting beyond the statutory dismissal date; see, e.g., In re Ruiz, 16 S.W.3d
921 (Tex. App.—Waco 2000, orig. proceeding [mand. denied]); and a second addressing the
merits of the suit. This would run counter to the very purpose of section 263.401 which is “to
carry out the recommendation of the Governor's Committee [to Promote Adoption] that parental
rights be terminated or families reunified within twelve months.” Ruiz, 16 S.W.3d at 926 (quoting
In re Bishop, 8 S.W.3d 412, 417 (Tex. App.—Waco 1999, orig. proceeding [mand. denied])).



      Accordingly, we set the new dismissal date at 180 days after the issuance of our mandate in
this cause. The trial court may not extend this deadline. “If the [trial] court . . . does not render
a final order or dismiss the suit on or before the required date for dismissal . . . , the court shall
dismiss the suit.” Tex. Fam. Code. Ann. § 263.401(c).
      We reverse the judgment and remand this cause to the trial court for further proceedings
consistent with this opinion.
 
                                                                         REX D. DAVIS
                                                                         Chief Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
      (Justice Gray dissenting)
Reversed and remanded
Opinion delivered and filed November 27, 2002
Publish
[CV06]